IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CARLOS B. SMITH, JR., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PX 15-0343 |
| WASHINGTON METROPOLITAN AREA | * | |
| TRANSIT AUTHORITY, | * | |
| | * | |
| Defendant. | * | |

******

**MEMORANDUM OPINION**

Pending in this employment discrimination case is the motion for summary judgment filed by Defendant Washington Metropolitan Area Transit Authority ("WMATA") (ECF No. 30). Plaintiff Carlos B. Smith has opposed the motion, and the matter is now ripe for decision. *See* D. Md. Loc. R. 105.2. The Court has determined that no hearing is necessary. *See* D. Md. Loc. R. 105.6. Upon consideration of the parties' briefing and the evidence in the record, the Court GRANTS WMATA's motion.

**I.   Background**

Smith, a United States Navy veteran born in Liberia, worked for WMATA as a Training Instructor in the Bus Maintenance Division between June 29, 2012, and June 18, 2013. Joint Appendix ("J.A.") 4, 67. Smith's direct supervisor during the relevant period was Jeffrey Duarte, who reported to the secondary supervisor, James Fourcade. J.A. 49. Phillip Wallace was the Bus Maintenance Division's General Superintendent. *See* J.A. 20. When Smith was hired, he was subject to a one-year probationary period pursuant to the collective bargaining

1

agreement between WMATA and the union representing Smith's position. J.A. 1, 22, 74 (Smith Dep. 22:5–7).

On April 30, 2013, one of Smith's students complained formally that Smith had been aggressive and used inappropriate language toward him during class. J.A. 36, 42. WMATA investigated the complaint, ultimately finding that Smith had "aggressively approach[ed] a student . . . and in a harsh tone [told] the student to 'shut up' and then impli[ed] [Smith] and the student can take the issue out in the hall," which was "unprofessional, discourteous, and not in the best interest of WMATA." J.A. 18. Because of this, WMATA suspended Smith for five days without pay, extended his probation by one year, and required him to take remedial measures including attending behavioral training classes. J.A. 18–20. Smith was also placed on a "performance plan." J.A. 129. Thereafter, Smith requested access to the investigation records, which WMATA denied, consistent with its policy. J.A. 49, 104–05 (Duarte Dep. 29:13–30:8).

Smith then filed his own complaint with WMATA alleging that a fellow instructor, Kim Watson, harassed him. Watson previously had been interviewed about the April 30 incident, during which time she had stated that she found Smith to be "intimidating" because he had discussed his prior "militia" service in his home country. J.A. 142–143. WMATA found that Smith's harassment complaint against Watson was unsubstantiated. J.A. 54–59, 61. On a separate unrelated occasion, Watson also told Smith and three other individuals of African national origin that she could have them "deported." Although Smith relayed this comment during his deposition, it was never the subject of a formal complaint or investigation by WMATA. J.A. 73 (Smith Dep. 18:3–8).

During Smith's time with WMATA, he received mixed performance reviews. Evaluators noted that Smith was among the best instructors in curriculum design, but also criticized Smith

2

for being "overbearing" and "braggadocious" with colleagues; lack of punctuality; and poor grammar, punctuation, and spelling. J.A. 133. Evaluators also accounted for the April 30 incident and referenced having to extend Smith's probationary period as a result. J.A. 133. On June 6, 2013, Smith requested in writing to be taken off probation and transferred to a different division. Roughly two weeks later, on June 18, 2013, WMATA terminated Smith for "unsatisfactory" job performance. J.A. 67.

Smith filed suit in against WMATA for disparate treatment on the basis of national origin discrimination in violation of Title VII (Count I), hostile work environment in violation of Title VII (Count II), retaliation in violation of Title VII (Count III), and wrongful termination in violation of Maryland law (Count IV). ECF No. 2 at 3–5. WMATA removed the action to this Court. ECF No. 1. After the close of discovery, WMATA moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that no genuine issue of material fact exists as to Smith's claims, and that WMATA is entitled to judgment as a matter of law. *See* ECF No. 30.

**II.     Standard**

On a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). "Summary judgment is appropriate only if the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Woollard v. Gallagher*, 712 F.3d 865, 873 (4th Cir. 2013). Summary judgment properly is granted when, construing the evidence in the record and drawing all reasonable inferences in

favor of the non-moving party, it nevertheless is "perfectly clear" that no genuine dispute of fact exists. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

### III. Discussion

#### A. National Origin Discrimination

Title VII prohibits discrimination against any employee on the basis of national origin. 42 U.S.C. § 2000e-2(a)(1). To make out a *prima facie* case of discrimination, a plaintiff must show (1) that he is a member of a protected class; (2) that he suffered from an adverse employment action; (3) that at the time his employer took the adverse employment action, he was performing at a level that met the employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside of the plaintiff's protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's" termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer can articulate such a reason, the burden shifts back to the plaintiff to prove that the proffered legitimate reason is mere pretext for discrimination. *See id.* at 804.

Here the parties do not dispute that Smith is a member of a protected class based on his Liberian national origin, and that he suffered adverse employment action, termination. WMATA argues, however, that no facts in the record support an inference that Smith was performing at a level that met WMATA's legitimate expectations. Alternatively, WMATA contends that Smith could not show that WMATA's non-discriminatory reasons for terminating him were pretextual.

When viewing the facts most favorably to Smith, no reasonable jury could find that he was meeting WMATA's employment expectations at the time of his termination. The record is clear that Smith, at best, received mixed performance reviews. In the first of the two

performance evaluations in the record, while noting that Smith possessed a "wealth of mechanical knowledge" and was one of the "top instructors" in curriculum design, his evaluation also particularly criticized Smith for his engagement with his colleagues, noting that he was "overbearing," that his conduct seemed "braggadocious to some and a put down to others," and that Smith made "less than favorable" remarks about his coworkers' abilities. Smith's review noted that Smith had "made efforts" to improve in that area, "but still ha[d] some way to go." J.A. 133. Smith also was criticized for his lack of punctuality and his review stated that he would be "monitored" for compliance. The review further noted that Smith needed improvement on "grammar, punctuation, and spelling" and may need to "seek remedial development opportunities" to address these deficiencies. J.A. 133.

Additionally, as described above, WMATA disciplined Smith for telling one of his students to "shut up" during class by extending Smith's probationary period and requiring other remedial measures. J.A. 18–20. Contrary to the requirements of his probationary period, the second of Smith's performance reviews noted that Smith had not "submitted any required reports electronically, including evaluations . . . , Administrative Activity Logs, or Weekly Snapshots." J.A. 133. WMATA subsequently fired Smith for "unsatisfactory" job performance. J.A. 76.

Smith does not challenge the contents of his reviews or the facts underlying the April 30 incident.[1] Smith himself admits that he told a student to shut up, possibly multiple times. *See* J.A. 38. Smith instead contends that the April 30 incident and the related investigation were the product of illicit discrimination. In particular, Smith asserts that Watson's statement related to the April 30 interview was based on Smith "being from Liberia. Her [sic] testified that she felt

---

[1] In this regard, the Court is at a loss for how Smith could argue that "[a]t no point during Plaintiff's tenure at WMATA, except his letter of termination, was his job performance questioned." ECF No. 31 at 11.

5

the way she felt because Plaintiff was from Liberia." ECF No. 31 at 7–8. However, no record evidence supports Smith's assertion. Watson's statement to WMATA instead noted that,

> she has received hostile and intimidating actions from Mr. Smith when evaluating an electrical course. She had a difference of opinion with what Mr. Smith was teaching and made a statement during a break to which Mr. Smith disagreed in an aggressive manner. Ms. Watson felt intimidated by Mr. Smith's demeanor. Ms. Watson states her feelings could be because of the stories Mr. Smith has shared regarding his past. Also, Ms. Watson states that she would have still felt intimidated and felt confirmation for why upon hearing additional stories told by Mr. Smith regarding when he was a teenager in a militia in his country and some of the situations in which he was involved.

J.A. 142. The Court cannot plausibly infer that it was Smith's Liberian heritage—and not references to participation in a militia—that gave rise to Watson's feelings of intimidation. Accordingly, Smith can point to no evidence that Watson's statements were motivated by any illegal animus.

Similarly, the record does not support Smith's claim that other WMATA employees—Marvin Martin, Geoffrey Noyes, Paul Crates, and Ray Albaugh—"all included Plaintiff being Liberian as part of their testimonies" for why they felt Smith to be intimidating. ECF No. 31 at 7. Like Watson, Noyes mentioned that he was concerned about potential hostility from Smith based on "Mr. Smith sharing stories of when Mr. Smith was younger and was a member of a militant group in Mr. Smith's home country." J.A. 24. But Noyes further stated that he "has not observed any behavior related to the stories." J.A. 24. Noyes makes no further reference to Smith's national origin.

Martin stated that he had witnessed Smith "screaming and hollering" in the classroom and behaving in an intimidating manner. J.A. 22. But at no point does Martin refer to Smith's national origin. Albaugh, too, does not mention any direct hostile interactions with Smith, and notes only that he (Albaugh) discussed with coworkers concerns stemming from "Smith having quite a history in the criminal system with traffic charges, gun possession, and a second degree

6

rape charge." J.A. 29. Finally, Crates mentioned that in addition to his concerns about Smith's hostility, Crates had "researched on his own" Smith's criminal record for carrying a concealed weapon, disorderly conduct, and resisting arrest. Crates further described Mr. Smith as "a loner," "standoffish" and as having the "potential to be a loose cannon." J.A. 26. None of these three interviewees appear to have referred in any manner to Smith's national origin.

Smith further contends that WMATA's handling of the April 30 incident was suspect because WMATA relied more heavily on students who were not present during the incident (namely, Martin, Noyes, Crates, and Albaugh) than those who were. *See* ECF No. 31 at 7. Putting to one side how WMATA's failure to weigh equally the testimony of these students, if true, gives rise to an inference of discrimination, this contention is wholly unsupported by the record. WMATA's investigation included written statements from five students present during the April 30 incident, J.A. 31–35, written statements and interview notes from three other students in Smith's class, J.A. 42–48, and Smith's own written statements and interview notes, J.A. 38, 39, 41. None of this evidence makes meaningful mention of Smith's national origin.

Accordingly, when viewed in the light most favorable to Smith, the record does not give rise to a plausible inference that Smith met WMATA's legitimate employment expectations. Nor can Smith demonstrate that WMATA's investigation of the April 30 incident was motivated or tainted by any national origin animus. The Court therefore grants summary judgment in favor of WMATA on Smith's discrimination claim.

### B. Hostile Work Environment

To prove a hostile work environment claim, a plaintiff must show that the complained-of conduct was (1) unwelcome; (2) based on a protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment; and

(4) imputable to his employer. *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495–96 (4th Cir. 2015). Smith's hostile work environment claim fails because the complained-of conduct, when viewed most favorably to Smith, is not based on his national origin.

Smith no doubt believes that he was working in a hostile environment. *See, e.g.*, J.A. 62. However, Smith admits that, in his view, his coworkers' hostility was directed at Smith's status as a college graduate with advanced certifications, and not his national origin. J.A. 76 (Smith Dep. 30:13–31:18).[2] Smith further stated that WMATA employees "do not like the fact that [Smith] came off the street into an instructor position and by applying for a senior engineer position and being selected for an interview, made [sic] my circumstances even worse." J.A. 65.

Moreover, the only incidents related to Smith's national origin are insufficient as a matter of law to constitute a hostile work environment. "Although a plaintiff may subjectively believe that the offending conduct created a hostile work environment, conduct that is not severe or pervasive enough to create an *objectively* hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *High v. R & R Transportation, Inc.*, 242 F. Supp. 3d 433, 442–43 (M.D.N.C. 2017) (internal marks and citation omitted, emphasis in original). Whether the plaintiff has established the existence of a hostile work environment depends on "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with [the] employee's work performance." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000). Discrete acts that are little more than a "mere utterance of an epithet which engenders offensive feelings" do not amount to a hostile work environment. *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (internal quotation marks and citations omitted). Rather, the harassing "conduct must be [so]

---

[2]  Smith also testified that he did not know why people were hostile to him. J.A. 77 (Smith Dep. 34:20–35:2).

extreme [as] to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

At best, Smith identifies two isolated incidents where his national origin was implicated: one involving a *student* who expressed negative views of Smith's status as an immigrant, J.A. 77 (Smith Dep. 35:14–16), and the other when Watson referred to having Smith "deported" because he is "from Africa," J.A. 73 (Smith Dep. 18:6–8). Smith admits that at no point did any of his supervisors express negative views concerning his birthplace. J.A. 77 (Smith Dep. 35:7–9). Nor does Smith identify how these comments alone amounted to a change in terms or conditions of employment. These incidents, while distasteful, do not create a hostile work environment. WMATA is entitled to summary judgment on this claim.

### C. Retaliation

In essence, Title VII prohibits an employer from taking discriminatory action against an employee for availing himself of Title VII rights or remedies. *See Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017). To prove retaliation, a plaintiff must demonstrate (1) that he engaged in a protected activity; (2) that the employer took an adverse employment action against him, and (3) a causal link exists between the two actions. *See Boyer-Liberto*, 786 F.3d at 281 (internal quotation marks and citation omitted).

Smith argues that his "question[ing]" WMATA's investigation into the April 30 incident and his transfer request constitute protected activity, the exercise of which led to his termination. ECF No. 31 at 12. The central flaw in Smith's argument, however, is that no evidence demonstrates that Smith's conduct is protected Title VII activity.

Smith's request for the underlying investigation records states that he "believe[d] the disposition of [the] investigation was unnecessarily unfair" in that he "was never given the

9

opportunity to rebut any inconsistencies" or "face [his] accusers." J.A. 50–51. However, no evidence exists that the April 30 investigation was motivated by Smith's national origin, and so his request for the underlying information cannot be considered, as a matter of law, activity protected under Title VII. Nor does Smith's request for a transfer implicate Title VII. Rather, when read most favorably to Smith, the transfer request amounts to a general airing of grievances about Smith's relationships with coworkers, and so, when viewed alone or in combination with Smith's request for investigation records, these actions cannot fairly be construed as protected Title VII activity. Summary judgment is granted in WMATA's favor.

### D. Wrongful Termination

Smith finally alleges that WMATA wrongfully terminated him in violation of Maryland public policy. Wrongful termination claims present "a narrow exception" to the general rule that at-will employees may be terminated at any time for any reason. *See Holden v. University System of Maryland,* 222 Md. App. 360, 367 (Md. Ct. Spec. App. 2015) (citing *Bagwell v. Peninsula Reg'l Med Ctr.*, 106 Md. App 470, 494 (Md. Ct. App 1995)). Accordingly, a plaintiff must prove not only that he was discharged, but also that the basis for the discharge violated some clear mandate of public policy, and that a nexus exists between the employer's termination decision and the employee's protected conduct. *See Yuan v. Johns Hopkins Univ.*, 452 Md. 436, 451 (Md. Ct. App. 2017).

As an initial matter, the Court notes that Plaintiff never pleaded with any particularity which Maryland law or policy WMATA contravened in terminating him. *See, e.g.*, ECF No. 2 at 4. Nor has Smith generated sufficient evidence to infer that Smith's employment was terminated

for other than legitimate reasons. Consequently, even when viewing the evidence most favorably to Smith, his wrongful termination claim must fail.[3]

## IV. Conclusion

Summary judgment is granted in WMATA's favor on all claims because the evidence, when viewed most favorably to Smith, cannot demonstrate that Smith met WMATA's legitimate employment expectations or that he suffered adverse employment action based on his national origin. A separate order shall follow.

2/2/2018  
Date

/S/  
Paula Xinis  
United States District Judge

---

[3] Alternatively, WMATA is immune from suit under the Eleventh Amendment of the United States Constitution for common law torts involving WMATA's discretionary hiring and firing decisions. *See, e.g. Beebe v. Wash. Metro Area Transit Auth.,* 129 F.3d 1283, 1287 (D.C. Cir. 1997).